IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 25-cv-02256-PAB-KAS

KILTER, LLC,

     Plaintiff,

v.

AURORA CLIMBING, INC.,

     Defendant.

---

**ORDER**

---

This matter comes before the Court on Defendant's Motion to Dismiss [Docket No. 22]. Plaintiff filed a response. Docket No. 28. Defendant filed a reply. Docket No. 33. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.

## I. BACKGROUND[1]

Kilter, LLC ("Kilter") is a Colorado corporation with its principal place of business located in Boulder, Colorado.[2] Docket No. 1 at 2, ¶ 4. Kilter is a climbing technology

---

[1] The facts below are taken from plaintiff's complaint, Docket No. 1, and from the parties' affidavits and exhibits. Docket Nos. 22-1, 22-2, 22-3, 28-1. Well-pled allegations in the complaint are presumed to be true, unless otherwise noted, for purposes of ruling on defendant's motion to dismiss. *See Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1070 (10th Cir. 2008). Facts presented in the affidavits and exhibits which are unrefuted by Kilter are also presumed to be true, unless otherwise noted, for purposes of ruling on defendant's motion to dismiss. *See N.E.L. v. Douglas Cnty., Colo.*, No. 15-cv-02847-REB-CBS, 2017 WL 1242992, at *14 (D. Colo. Jan. 27, 2017).

[2] The complaint alleges that "Kilter, Inc. is a Colorado corporation with its principal place of business located at 3762 Puritan Way, Unit 3, Frederick, Colorado 80516." Docket No. 1 at 2, ¶ 4. However, the case heading refers to "Kilter, LLC" and the complaint otherwise states that Kilter is "based in Boulder, Colorado." *Id.* at 1, 4,

company which developed the "Kilter Board," a climbing wall with a customized layout of unique holds that "was designed to be shared around the world." *Id.* at 4, ¶ 12. Aurora Climbing, Inc. ("Aurora") is a Canadian corporation with its principal place of business located in British Columbia, Canada. *Id.* at 2, ¶ 5. Aurora sold "light kits" to Kilter—a component Kilter uses in manufacturing the Kilter Boards (the "Boards"). *Id.* at 4, ¶ 13. In addition to selling Kilter the light kits, Aurora was hired by Kilter to create a software application (the "Application") used in tandem with the Boards. *Id.* at 1, ¶ 1. Kilter avers that the Application was jointly developed by the parties. *Id.* The Application is a mobile technology that allows users to track their ascents on the Boards. *Id.* at 4, ¶ 13. The Application is used by a "global network of professional athletes, route setters, gyms, and all other Kilter Board users." *Id.* at 5, ¶ 16. Kilter purchased light kits from Aurora in 2024 through an interim purchase agreement. Docket No. 22-3 at 4, ¶ 21; Docket No. 22-1. The interim purchase agreement contains a choice-of-law clause indicating that the agreement is governed by the laws of British Columbia and any applicable federal laws of Canada. Docket No. 22-1 at 7. The interim purchase agreement also contains a forum selection clause, indicating that the parties submit to

---

¶ 12. The Colorado Secretary of State website does not list any business registered under the name Kilter, Inc. However, it does list Kilter, LLC and states that its principal office street address is 4840 Sterling Dr, Unit A, Boulder CO 80301. Summary, https://www.coloradosos.gov/biz/BusinessEntityDetail.do?quitButtonDestination=BusinessEntityResults&nameTyp=ENT&masterFileId=20141556618&entityId2=20141556618&fileId=20141556618&srchTyp=ENTITY (last visited Jan. 9, 2026). The Court previously noted this discrepancy and requested that Kilter specify whether it is a limited liability company or a corporation. Docket No. 16. Kilter subsequently filed a corporate disclosure statement specifying that it is "Kilter, LLC" and "is a private corporation." Docket No. 18.

the exclusive jurisdiction of the federal or provincial courts located in British Columbia. *Id.*

On July 22, 2025, Kilter brought this action against Aurora. Docket No. 1. Kilter alleges that Aurora impermissibly distributed the Application to Kilter's competitors and attempted to coerce Kilter to accept new terms regarding ownership of the Application. *Id.* at 5-6, ¶¶ 18-20. Kilter claims that Aurora also changed the warranty period of its light kits. *Id.* at 6, ¶ 21. Specifically, Kilter alleges that, as a "power grab," Aurora changed the warranty period from being in place for one year following the end customer's purchase of the light kits to being in place for one year following Kilter's receipt of the light kits. *Id.* Additionally, Kilter alleges that the light kits purchased from Aurora in 2024 fail at an exceedingly high rate. *Id.*, ¶ 22. Finally, Kilter avers that Aurora defamed Kilter to its customers, accusing Kilter of using unauthorized replicas of Aurora's light kits. *Id.* at 7, ¶ 23.

Kilter asserts eight claims for relief: a claim for breach of contract; a claim for breach of the implied duty of good faith and fair dealing; in the alternative, a claim for promissory estoppel; in the alternative, a claim for unjust enrichment; a claim for defamation; a claim for violations of the Colorado Deceptive Trade Practices Act, Colo. Rev. Stat. § 6-1-105; a claim for tortious interference with a contract; and a claim for tortious interference of prospective business relations. *Id.* at 8-17, ¶¶ 26- 80. All of these claims arise out of either the agreement to develop the Application, the allegedly changing warranty period, the sale of the 2024 light kits, or the alleged defamatory statements. *Id.* On August 29, 2025, Aurora filed a motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(2), 9(b), and (12)(b)(6). Docket No. 22. Aurora

3

contends that the Court should dismiss this case because the Court lacks personal jurisdiction over Aurora.  Docket No. 22 at 1.  Alternatively, Aurora argues that Kilter's claim for violations of the Colorado Deceptive Trade Practices Act should be dismissed. *Id.* at 1-2.  On September 29, 2025, Kilter filed a response.  Docket No. 28.  On October 14, 2025, Aurora filed a reply.  Docket No. 33.  On February 23, 2026, Aurora filed a Notice of Supplemental Authority, informing the Court that—in a case Aurora brought against Kilter—a British Columbia court determined, among other things, that the forum selection clause in the interim purchase agreement appeared enforceable, that there is a real and substantial connection between British Columbia and the underlying dispute, and that it would not stay the action in favor of Colorado.  Docket No. 34 at 2; *see generally* Docket No. 34-1.  Kilter filed a response.  Docket No. 35.

## II.  LEGAL STANDARD

The Tenth Circuit has noted that the extent of a plaintiff's burden to establish personal jurisdiction and the scope of a court's review "depend in part on the nature of the district court's response to defendants' motion seeking dismissal for lack of personal jurisdiction." *Dudnikov*, 514 F.3d at 1069.  "A district court has discretion to resolve such a motion in a variety of ways – including by reference to the complaint and affidavits, a pre-trial evidentiary hearing, or sometimes at trial itself." *Id.*  District courts also have discretion to consider other material outside of the pleadings when ruling on a Rule 12(b)(2) motion. *N.E.L.*, 2017 WL 1242992, at *14 (collecting cases).  Here, neither party requests an evidentiary hearing; however, Aurora has attached a declaration by its founder, Peter Michaux, in support of its motion to dismiss, Docket No. 22-3, and Kilter attaches a declaration by its Chief Operating Officer, Jackie Hueftle, Docket No. 28-1, to its response.  Aurora also attached the interim purchase agreement

to its motion.  Docket No. 22-1.  The Court therefore will exercise its discretion to resolve the motion based on the documents that the parties submitted.  This decision dictates the standard of review applied.  *See Dudnikov*, 514 F.3d at 1070.  "When, as here, personal jurisdiction is found wanting on the basis of the complaint and affidavits," the court "tak[es] as true all well-pled (that is, plausible, non-conclusory, and non-speculative) facts alleged in plaintiffs' complaint."  *Id.* (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556–62 (2007)).  "Similarly, any factual disputes in the parties' affidavits must be resolved in plaintiffs' favor."  *Id.* (citing *FDIC v. Oaklawn Apartments*, 959 F.2d 170, 174 (10th Cir. 1992)).  However, "[t]he court also should accept as true those facts presented in defendant's affidavits or exhibits that remain unrefuted by plaintiff."  *N.E.L.*, 2017 WL 1242992, at *14 (citing *Glass v. Kemper Corp.*, 930 F. Supp. 332, 337 (N.D. Ill. 1996)).

"Where a defendant is moving to dismiss under Fed. R. Civ. P. 12(b)(2) for lack of personal jurisdiction and under Fed. R. Civ. P. 12(b)(6) for failure to state a cognizable claim for relief, the court should first address the challenge to personal jurisdiction."  *N.E.L.*, 2017 WL 1242992, at *14; *see also OMI Holdings, Inc. v. Royal Ins. Co. of Canada*, 149 F.3d 1086, 1091 (10th Cir. 1998).  The plaintiff bears the burden of establishing personal jurisdiction over a non-resident defendant.  *See Wenz v. Memery Crystal*, 55 F.3d 1503, 1505 (10th Cir. 1995).  "In the preliminary stages of litigation, Plaintiff['s] burden is light."  *Walker v. Wegener*, No. 11–cv–3238–PAB–KMT, 2012 WL 1020673, at *3 (D. Colo. Mar. 2, 2012).

"To obtain personal jurisdiction over a nonresident defendant in a diversity action, a plaintiff must show both that jurisdiction is proper under the laws of the forum state

and that the exercise of jurisdiction would not offend due process." *Intercon, Inc. v. Bell Atl. Internet Sols.*, 205 F.3d 1244, 1247 (10th Cir. 2000) (citation omitted). Because Colorado's long-arm statute permits the exercise of jurisdiction to the full extent of the United States Constitution, the personal jurisdiction inquiry under Colorado law "collapses into the single due process inquiry." *Id.* (citation omitted); *Hood v. Am. Auto Care*, LLC, 21 F.4th 1216, 1220 (10th Cir. 2021); *Archangel Diamond Corp. v. Lukoil*, 123 P.3d 1187, 1193 (Colo. 2005). Personal jurisdiction comports with due process where a defendant has minimum contacts with the forum state and where those contacts are such that assuming jurisdiction does not offend "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

Courts may exercise either general or specific jurisdiction over a defendant. For corporations, "the place of incorporation and principal place of business are 'paradig[m] . . . bases for general jurisdiction.'" *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011)). "A court may [also] assert general jurisdiction over foreign . . . corporations to hear any and all claims against them when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State." *Old Republic Ins. Co. v. Cont'l Motors, Inc.*, 877 F.3d 895, 904 (10th Cir. 2017) (quoting *Goodyear*, 564 U.S. at 919). Mere continuous and systematic business contacts with the forum are insufficient; the affiliations with the state must be so continuous and systematic as to render the corporation essentially at home in the forum state. *Id*. at 139.

"Specific jurisdiction . . . is premised on something of a *quid pro quo*: in exchange for 'benefitting' from some purposive conduct directed at the forum state, a party is

deemed to consent to the exercise of jurisdiction for claims related to those contacts."
*Dudnikov*, 514 F.3d at 1078.  Courts typically make three inquiries to determine if a
state's exercise of sovereignty over a defendant can be described as fair and just for
specific jurisdiction: "(1) whether the defendant purposefully directed its activities at
residents of the forum state; (2) whether the plaintiff's injury arose from those
purposefully directed activities; and (3) whether exercising jurisdiction would offend
traditional notions of fair play and substantial justice."  *Newsome v. Gallacher*, 722 F.3d
1257, 1264 (10th Cir. 2013).  "[W]here, as here, the issue is determined on the basis of
the pleadings and affidavits, that burden may be met by a *prima facie* showing."
*Sharpshooter Spectrum Venture, LLC v. Consentino*, No. 09-cv-0150-WDM-KLM, 2011
WL 3159094, at *2 (D. Colo. July 26, 2011) (citing *Shrader v. Biddinger*, 633 F.3d 1235,
1239 (10th Cir. 2011)).  This showing must be made "with respect to each of the claims
alleged."  *Dental Dynamics, LLC v. Jolly Dental Grp., LLC*, 946 F.3d 1223, 1228 (10th
Cir. 2020) (citation omitted).

The court considers several factors when analyzing whether exercising
jurisdiction would offend notions of fair play and substantial justice, including: (1) the
burden on the defendant; (2) the forum state's interest in adjudicating the dispute; (3)
the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate
judicial system's interest in obtaining the most efficient resolution of controversies; and
(5) the shared interest of the states in furthering fundamental substantive social policies.
*Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985); *see also Hood*, 21 F.4th at
1224 ("[T]he forum State can exercise personal jurisdiction over an out-of-state
defendant that has injured a resident plaintiff in the forum State if (1) the defendant has

purposefully directed activity to market a product or service at residents of the forum

State and (2) the plaintiff's claim arises from essentially the same type of activity, even if

the activity that gave rise to the claim was not directed at forum residents.").

## III. ANALYSIS

Kilter argues that the Court has both general and specific jurisdiction over

Aurora.  The Court will first address whether it has general jurisdiction over Aurora.

Because the Court finds that it does not, the Court will then address whether it has

specific jurisdiction.

### A. General Jurisdiction

Kilter argues that the Court has general jurisdiction over Aurora because of

Aurora's business relationship with Kilter, a Colorado limited liability company.  Docket

No. 28 at 15.  Kilter notes that this business relationship led to the development of the

Application, which is used by Colorado residents, and led to the sale of hundreds of light

kits in Colorado.  *Id.*  This is not sufficient to confer the Court with general jurisdiction

over Aurora.  The Supreme Court has held that "[t]he paradigm all-purpose forums for

general jurisdiction are a corporation's place of incorporation and principal place of

business." *Daimler AG*, 571 U.S. at 118 (citation omitted).  It is only "in an exceptional

case" that "a corporation's operations in a forum other than its formal place of

incorporation or principal place of business may be so substantial and of such a nature

as to render the corporation at home in that State." *Id.* at 139 n.19.  While Aurora does

have a business relationship with Kilter, that relationship is not so substantial as to

render Aurora at home in Colorado.  Aurora is not registered to do business in Colorado

and lacks ownership of Colorado property, registered agents, offices, employees,

assets, and bank accounts.  Docket No. 33 at 2 (citations omitted).  Merely conducting

regular business with a Colorado corporation is insufficient to establish general jurisdiction over that entity in Colorado. *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416-17 (1984) (holding that an international company which did not have a place of business in Texas and was not licensed to do business in Texas, but sent personnel to Texas and regularly conducted business with a Texas corporation, was not subject to general personal jurisdiction in Texas). Thus, no exceptional case exists which would warrant subjecting Aurora to general jurisdiction in Colorado.

### B. Specific Jurisdiction

In order for the Court to have specific jurisdiction over Aurora, Kilter must show that Aurora has "minimum contacts" with Colorado and that the exercise of personal jurisdiction over Aurora is reasonable. *Int'l Shoe Co.* 326 U.S. at 316.

### 1. Minimum Contacts

To determine whether Aurora has minimum contacts with Colorado, the Court must analyze whether Aurora purposefully directed its activities at residents of the forum state and, if so, whether Kilter's injuries arose from those purposefully directed activities. *Newsome*, 722 F.3d at 1264.

### a. Purposeful Direction

Kilter has a longstanding business relationship with Aurora. Docket No. 1 at 2-3, ¶ 7. Specifically, in 2017, Kilter requested that Aurora help it create the Application. *Id.* at 4, ¶ 13. Moreover, Kilter purchased hundreds of light kits from Aurora over the course of years—a key component used in manufacturing the Boards. *Id.* at 2-4, ¶¶ 7, 13. Over the course of their business relationship, Kilter paid Aurora over $4,800,000 for its products and services. *Id.* at 2-3, ¶ 7. Additionally, Mr. Michaux—Aurora's founder—visited Colorado twice. *Id.*; Docket No. 28 at 5. Mr. Michaux first visited

9

Colorado in 2018 to work on the installation of Aurora's light kits on a prototype Board.

Docket No. 22-3 at 3, ¶ 13; Docket No. 28-1 at 5, ¶ 18.  In 2019, Mr. Michaux visited

Colorado again to attend a trade show where he promoted Aurora and Kilter's products

to climbing-gym owners and climbers.[3]  Docket No. 22-3 at 3, ¶ 13; Docket No. 28-1 at

5, ¶ 19.  These facts show that the parties had a longstanding business relationship with

one another.  Aurora's ongoing business relationship with a Colorado company

constitutes activity which was purposefully directed at a resident of Colorado.  *See*

*Benton v. Cameco Corp.*, 375 F.3d 1070, 1077 (10th Cir. 2004) ("By engaging in a

business relationship with [plaintiff], who operates his business from Colorado,

[defendant] purposefully availed itself of the privilege of conducting activities within the

forum State, thus invoking the benefits and protections of its laws." (internal quotations,

alternations, and citations omitted)); *see also Burger King*, 471 U.S. at 473 ("[P]arties

who reach out beyond one state and create continuing relationships and obligations

with citizens of another state are subject to regulation and sanctions in the other State

for the consequences of their activities." (internal quotations and citation omitted)).

In *Burger King*, 471 U.S. at 478-81, the Supreme Court held that entering into a

longstanding business relationship with a company headquartered in another state

could subject a party to the specific jurisdiction of that state.  *Id.*  There, the defendant

entered into a franchise agreement with Burger King, which the Court described as "a

carefully structured 20-year relationship that envisioned continuing and wide-reaching

---

[3] In the complaint, Kilter claims that "Aurora . . . visited Colorado during the parties' business relationship to help test and market the software application."  Docket No. 1 at 3, ¶ 7.  However, in their briefs and affidavits, neither party describes either visit as having anything to do with the Application.

10

contacts with Burger King in Florida." *Id.* at 480.  The Court noted that the defendant

accepted "long-term and exacting regulation of his business from Burger King's Miami

headquarters." *Id.*  This indicated that the nature of the defendant's relationship with

Burger King could not be viewed as "random, fortuitous, or attenuated." *Id.* (internal

quotations and citations omitted).

Kilter has provided minimal allegations regarding the details of its business

relationship with Aurora. *See generally* Docket No. 1; Docket No. 28.  It is not as

longstanding as Burger King's relationship, as it only goes back to 2017.  Docket No. 1

at 4, ¶ 13.  Moreover, there is no indication that the parties' contracts contemplated the

kind of "exacting regulation" found in *Burger King*. *See Burger King*, 471 U.S. at 480.

While the complaint has minimal allegations regarding the parties' contracts to buy light

kits, Aurora attached an interim purchase agreement to its motion.[4]  Docket No. 22-1.

The interim purchase agreement specifically dealt with the purchase of the 2024 light

kits, which were sent in three separate installments. *Id.* at 2-3.  Assuming the interim

purchase agreement is indicative of the parties' course of dealing, each purchase order

is distinct and requires Aurora to supply the light kits in specified quantities and at

specified dates.[5]  Thus, the parties' relationship does not appear to be as "carefully

structured" as the relationship in *Burger King*. *See Burger King*, 471 U.S. at 480.

---

[4] Aurora alleges that, in 2023, Kilter sued Aurora in the District of Colorado.
Docket No. 22 at 2.  The parties agreed to a limited settlement. *Id.*  As part of that
settlement, Kilter dismissed its case without prejudice and Aurora agreed to sell more
light kits to Kilter. *Id.*  That deal was memorialized in the attached interim purchase
agreement. *Id.* at 2-3.

[5] Kilter provides no details of how it typically purchases the light kits from Kilter
and does not claim that the interim purchase agreement differs from previous
arrangements.

However, *Burger King* does not stand for the narrow proposition that the parties' business relationship must be as structured, exacting, and longstanding as a franchise agreement in order to confer a court with specific jurisdiction.  Rather, the question is whether the parties' business relationship demonstrates that the defendant's activity with the company in the forum state is purposefully directed towards that state, rather than being "random, fortuitous, or attenuated."  *Id.* (internal quotations and citations omitted).  Aurora's continuous sale of millions of dollars' worth of light kits to Kilter demonstrates a conscious decision to do business with a Colorado corporation.  Aurora voluntarily assumed obligations to ship its light kits to Colorado. [6]  Those light kits were used by Kilter, a Colorado company, as a part of the Boards it manufactures.[7]  Docket No. 1 at 4, ¶ 13.  Moreover, Aurora voluntarily assumed the obligation to jointly develop the Application with Kilter, for use with Kilter's products.  *Id.* at 1, ¶ 1.  Through these

---

[6] Over the course of the parties' dealings, Kilter sometimes arranged for a third-party carrier to pick up the 2024 light kits and Aurora sometimes shipped the light kits directly to end users.  Docket No. 22-3 at 4-5, ¶ 23; Docket No. 28-1 at 3, ¶ 9.  At other times, Aurora shipped bulk orders directly to Kilter in Colorado.  Docket No. 28-1 at 3, ¶ 10.

[7] It is not clear whether the light kits were used in the manufacturing of the Boards or whether they were used alongside the Board.  For instance, Kilter alleges that "Aurora sold light kits to Kilter *for use with* the Kilter Board."  Docket No. 1 at 4, ¶ 13.  This language indicates that the light kits are a separate item used alongside the Board.  Moreover, the fact that, at times, Aurora shipped the light kits directly to end users indicates that they are not included in the Board as part of the manufacturing process.  *See* Docket No. 28-1 at 3, ¶ 9.  However, Kilter also describes the light kits as "a part," stating that, "[t]o be clear, Aurora is only a supplier of a part, while Kilter is the manufacturer of the Kilter Board."  Docket No. 1 at 4, ¶ 13.  This language indicates that the light kits are a part of the Boards and are attached to the Board as part of the manufacturing process.  Moreover, Aurora states that Kilter "combined [the light kits] with its climbing holds."  Docket No. 22 at 8.  This language further indicates that Kilter uses the light kits when it manufactures the Boards.  Regardless of whether the Kilter Boards are attached during manufacturing or sold as a separate item, Kilter utilized the light kits as a part of its business.  Docket No. 1 at 4, ¶ 13.

interactions, Aurora derived the benefit of being paid over $4,8000,000.  "[W]here individuals purposefully derive benefit from their interstate activities, . . . it may well be unfair to allow them to escape having to account in other States for consequences that arise proximately from such activities; the Due Process Clause may not readily be wielded as a territorial shield to avoid interstate obligations that have been voluntarily assumed."  *Burger King*, 471 U.S. at 473-74 (internal quotations omitted).  Mr. Michaux's visits to Colorado to engage in business with Kilter further demonstrate that Aurora actively pursued a business relationship in Colorado.  *See Benton*, 375 F.3d at 1077-78 (stating that a business sending a representative to Colorado in order to further a business relationship weighs towards the relationship establishing minimum contacts with Colorado).  Thus, Aurora purposefully directed its activities at Colorado, and therefore should reasonably anticipate that it could be haled into court there.  *See World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980) ("The foreseeability that is critical to due process analysis is . . . that the defendant's conduct and connection with the forum [State] are such that he should reasonably anticipate being haled into court there.").

Aurora's arguments to the contrary are unavailing.  Aurora cites *Walden v. Fiore*, 571 U.S. 277, 286 (2014), for the proposition that "a defendant's relationship with a plaintiff . . . is an insufficient basis for jurisdiction."  Docket No. 22 at 5-6 (quoting *Walden*, 571 U.S. at 286).  Thus, Aurora argues that its business relationship with Kilter cannot form the basis for personal jurisdiction.  *Id.*  The facts in *Walden*, however, are distinguishable from this case.  There, Transportation Security Administration ("TSA") agents searched the plaintiffs at the San Juan airport in Puerto Rico and found almost

13

$97,000 in cash. *Walden*, 571 U.S. at 279-80. Plaintiffs informed the agents that they won the money gambling. *Id.* Plaintiffs were ultimately cleared for departure to Atlanta, where they intended to catch a connecting flight to Las Vegas. *Id.* A task force in Atlanta was informed about the money and ultimately seized the cash at the Atlanta airport. *Id.* Plaintiffs filed suit in the United States District Court for the District of Nevada. *Id.* at 281. In analyzing whether personal jurisdiction existed in Nevada, the Supreme Court noted that none of the defendant's conduct occurred in Nevada. *Id.* at 288. Thus, the Court held that directing conduct towards the plaintiffs in Georgia when the plaintiffs only resided in Nevada by happenstance did not establish personal jurisdiction in Nevada. *Id.* at 288-89. The Court emphasized that, "[d]ue process requires that a defendant be haled into court in a forum State based on his own affiliation with the State, not based on the 'random, fortuitous, or attenuated' contacts he makes by interacting with other persons affiliated with the State." *Id.* at 286 (quoting *Burger King*, 471 U.S. at 475). Here, Aurora's connection to Colorado is not random, fortuitous, or attenuated. Aurora did not direct conduct at Kilter in another state. Rather, Aurora actively pursued a business relationship with Kilter, a Colorado company, by shipping light boards to Colorado, jointly developing the Application with Kilter, and visiting Colorado to develop its business relationship with Kilter. Thus, Aurora purposefully and actively directed its conduct towards Colorado, rather than merely having an attenuated link to Colorado through directing conduct towards Kilter in another state. Accordingly, *Walden* is inapposite.

Aurora also argues that there is no personal jurisdiction because the Application is used and deployed worldwide and because the light kits are sold to clients around the

14

globe.  Docket No. 22 at 6-8.  Aurora states that neither the Application nor the light kits were marketed specifically towards Colorado citizens.  *Id.*  Personal jurisdiction can be established through exploiting the market of the forum state.  *Old Republic Ins. Co. v. Cont'l Motors, Inc.*, 877 F.3d 895, 915 (10th Cir. 2017).  Personal jurisdiction is more likely to be established through a market exploitation theory if there are high sales volumes in the forum state and advertising that targets the forum state.  *Id.*  Thus, because the Application is not used disproportionately by Coloradans,[8] there are no allegations that the light kits are sold disproportionately to Coloradans, and there is no advertising targeting Colorado, there is likely not personal jurisdiction over Aurora through a market exploitation theory.  However, here, personal jurisdiction is conferred through Aurora's longstanding business relationship with Kilter, not through its exploitation of the market.  Thus, it is irrelevant that there is no disproportionate exploitation of Colorado's market.

### b. Arising Out Of

It is not enough that Aurora purposefully directed its conduct towards Colorado; Kilter's injuries must also "arise out of or relate to" Aurora's forum contacts.  *Compañía de Inversiones Mecantiles, S.A. v. Grupo Cementos de Chihuahua S.A.B. de C.V.*, 970 F.3d 1269, 1284 (10th Cir. 2020) (citing *Burger King*, 471 U.S. at 472-73).  The "arising out of" requirement "has been subject to different interpretations."  *Id.*  "Some courts have interpreted the phrase 'arise out of' as endorsing a theory of 'but-for' causation, while other courts have required proximate cause to support the exercise of personal jurisdiction."  *Id.* (quoting *Dudnikov*, 514 F.3d at 1078).  Under but-for causation, "any

---

[8] Out of 935 climbing gyms worldwide that are registered on the Application, only 18 are located in Colorado.  Docket No. 22 at 7; Docket No. 22-3 at 4, ¶ 18.

event in the causal chain leading to the plaintiff's injury is sufficiently related to the claim to support the exercise of specific jurisdiction." *Id.* at 1284-85 (quoting *Dudnikov*, 514 F.3d at 1078). Conversely, proximate causation is "[c]onsiderably more restrictive" and "turns on whether any of the defendant's contacts with the forum are relevant to the merits of the plaintiff's claim." *Id.* at 1285 (quoting *Dudnikov*, 514 F.3d at 1078). While the Tenth Circuit has not chosen between the two tests, it consistently applies the "proximate-cause approach" in contract actions. *Id.* (citing *Emp'rs Mut. Cas. Co. v. Bartile Roofs, Inc.*, 618 F.3d 1153, 1161 n.7 (10th Cir. 2010)). This action brings both contract claims and tort claims. Docket No. 1 at 8-17, ¶¶ 26- 80. However, the Court need not decide which test to apply because Kilter's injuries arise out of Aurora's forum contacts under even the "more restrictive proximate-cause approach." *Compañía*, 970 F.3d at 1285 (citation omitted).

When using the proximate-cause approach to evaluate the arising out of requirement, courts must "determine whether a nexus exists between [defendant's] forum-related contacts and [plaintiff's] cause of action." *Id.* (internal quotations and citation omitted). Here, as explained above, Aurora's forum-related contacts stem from its longstanding business relationship with Kilter to jointly develop the Application and to sell the light kits used in the Boards. Thus, the Court must determine whether a nexus exists between the joint development of the Application and the sale of light kits and Kilter's causes of action.

Kilter's breach of contract claim, breach of the duty of good faith claim, and alternative promissory estoppel and unjust enrichment claims all stem from the agreement to jointly develop the Application. *See* Docket No. 1 at 8-13, ¶¶ 26-56.

16

However, Kilter provides few details about this agreement.  *See id.*  Kilter alleges that

Aurora breached the duty of good faith in regard to the agreement to jointly develop the

Application by, among other things, selling the allegedly defective 2024 light kits to

Kilter.  *Id.* at 10-11, ¶ 40.  It is unclear what the sale of the 2024 light kits has to do with

an agreement to jointly develop the Application.  Kilter also claims that Aurora breached

the agreement to jointly develop the Application by changing the warranty period on the

light kits.  *Id.* at 9, ¶ 35.  Again, it is unclear how such change is related to the

agreement to jointly develop the Application.  Despite these issues, Kilter is consistent

in alleging that the causes of action for the breach of contract, breach of the duty of

good faith, and alternative promissory estoppel and unjust enrichment claims arise out

of the agreement to jointly develop the Application.  *Id.* at 9-12, ¶¶ 28-30, 40, 44, 53.  As

mentioned above, the agreement to jointly develop the Application is part of the parties'

business relationship, which is a Colorado contact.  In its breach of contract claim, Kilter

alleges that, "[a]s a result of Aurora's breaches, Kilter has suffered monetary damages

in an amount exceeding $1,000,000.00."  *Id.* at 10, ¶ 37.  Therefore, Kilter asserts that

its alleged injury of losing more than $1,000,000 arises out of Aurora's Colorado

contact.  To use the "proximate causation" language, a nexus exists between Aurora's

agreement to develop the Application with Kilter—a Colorado contact—and Kilter's

claim that Aurora breached that agreement.

Aurora argues that, according to the complaint, Aurora shared the Application

with Kilter's competitors, Aurora refused to implement software features, and Aurora

incorrectly asserted ownership over the app.  Docket No. 22 at 11.  Aurora states that

these actions are what led to Kilter's injuries, and because they would have occurred in

British Columbia, the Application-related injuries "stem from British Columbia." *Id.* However, even if these individual actions took place outside of Colorado, Aurora's agreement to develop the Application with Kilter is still a forum-contact with Colorado. As explained above, the agreement to develop the Application is part of the parties' business relationship, a Colorado contact. Moreover, the Court finds that Kilter and Aurora jointly developed the Application as part of the agreement. Kilter alleges that, as part of the agreement to develop the Application, Kilter designed various functions of the Application, directed the Application's configuration, conducted research and development testing, and guided customer experience. Docket No. 1 at 9, ¶ 28. Thus, the development of the Application occurred in both Colorado and British Columbia, further supporting that it constitutes a Colorado contact. The breach of contract claim and its corresponding damages—as well as the related breach of the duty of good faith, unjust enrichment, and promissory estoppel claims—arise out of the agreement to jointly develop the Application. Therefore, there is a nexus between the agreement to develop the Application and Kilter's breach of contract claim. This is not negated by the fact that some of the individual actions which led to Kilter's injuries occurred in British Columbia.

Kilter also brings claims for defamation, violations of the Colorado Deceptive Trade Practices Act, tortious interference with a contract, and tortious interference of prospective business relations. Docket No. 1 at 13-17, ¶¶ 57-80. These claims arise from the allegedly defamatory statements Aurora made, from Aurora changing the warranty for the light kits, from the sale of the allegedly defective 2024 light kits, and from certain actions Aurora took regarding the Application. *Id.* For instance, Kilter's

Colorado Deceptive Trade Practices Act claim alleges that Aurora engaged in deceptive trade practices by changing the period it would honor the warranty, by selling the allegedly defective 2024 light kits, and by its allegedly defamatory statements. *Id.* at 14-15, ¶¶ 64-66.  Kilter alleges that "[t]he deceptive trade practices caused actual damages or losses to Kilter," but does not elaborate on what those damages are. *Id.* at 16, ¶ 69. Nevertheless, a nexus exists between Aurora's sale of the light kits to Kilter and any damages stemming from Aurora's sale of those light kits.  Aurora's sale of the light kits to Kilter is part of the parties' business relationship and constitutes a Colorado contact. Thus, the claim arises out of Aurora's forum-contact with Colorado.

It is less clear that personal jurisdiction can be established through Aurora's allegedly defamatory statements.  The allegedly defamatory statements consist of emails which state, among other things, that Kilter was using unauthorized replicas of Aurora's light kits. *Id.* at 7-8, ¶ 23.  The Tenth Circuit has held that, for personal jurisdiction to arise out of defamatory emails, the defendant must have "[1] deliberately directed its message at an audience in the forum state and [2] intended harm to the plaintiff occurring primarily or particularly in the forum state." *XMission, L.C. v. Fluent LLC*, 955 F.3d 833, 845 (10th Cir. 2020) (quoting *Shrader v. Biddinger*, 633 F.3d 1235, 1241 (10th Cir. 2011)).  In *XMission*, the court held that the plaintiff's defamatory statements about the defendant did not confer the plaintiff's home state with personal jurisdiction when the emails were not targeted towards an audience in the plaintiff's home state. *Id.* at 846.

In this case, Mr. Michaux asserts in his declaration, and Kilter does not refute, that Mr. Michaux wrote the statements and sent them via electronic mail from British

19

Columbia.  Docket No. 22-3 at 5, ¶¶ 24-26.  Mr. Michaux avers that all of the electronic mail recipients are residents of foreign countries, and that none live or work in Colorado. *Id.*, ¶ 27.  Even if Aurora intended to harm Kilter in Colorado, it did not direct its message at a Colorado audience.  Thus, the defamatory statements cannot confer the Court with personal jurisdiction.  However, under the doctrine of "pendent personal jurisdiction," the Court can still, in its discretion, exercise personal jurisdiction over any defamation-related claims.  *United States v. Botefuhr*, 309 F.3d 1263, 1272-73 (10th Cir. 2002).  Pendent personal jurisdiction is similar to the concept of supplemental subject matter jurisdiction and holds that, "once a district court has personal jurisdiction over a defendant for one claim, it may 'piggyback' onto that claim other claims over which it lacks independent personal jurisdiction, provided that all the claims arise from the same facts as the claim over which it has proper personal jurisdiction."  *Id.* at 1272. The exercise of pendent personal jurisdiction is a matter of the judicial discretion.  *Id.* at 1273.  It is unnecessary for the Court to decide whether it will exercise pendent personal jurisdiction over the claims which arise from the allegedly defamatory statements because the Court finds that the exercise of personal jurisdiction "offend[s] traditional notions of fair play and substantial justice."  *Newsome*, 722 F.3d at 1264 (internal quotation and citation omitted).

### 2.  Reasonableness

"When a plaintiff satisfies its minimum contacts burden, the burden shifts to the defendant to demonstrate that exercising personal jurisdiction would nonetheless 'offend traditional notions of fair play and substantial justice.'"  *Id.* at 1271 (quoting *Dudnikov*, 514 F.3d at 1080).  In other words, the defendant "must present a compelling case that the presence of some other considerations would render jurisdiction

unreasonable." *Burger King*, 471 U.S. at 477. As mentioned above, when determining whether the exercise of personal jurisdiction would be unreasonable, courts analyze the following factors: "(1) the burden on the defendant; (2) the forum state's interest in resolving the dispute; (3) the plaintiff's interest in receiving convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states in furthering fundamental social policies." *Dental Dynamics*, 946 F.3d at 1229.

### a. Burden on Defendant

In *Benton*, the Tenth Circuit noted that "[t]he burden on the defendant of litigating the case in a foreign forum is of primary concern in determining the reasonableness of personal jurisdiction. . . . When the defendant is from another country, this concern is heightened and great care and reserve should be exercised before personal jurisdiction is exercised over the defendant." *Benton*, 375 F.3d at 1079 (internal quotations and citations omitted). Given these considerations, the Tenth Circuit found that the first factor weighed against the exercise of personal jurisdiction when the defendant was a Canadian corporation which had no office or property in Colorado, was not licensed to do business in Colorado, and had no employees in Colorado. *Id.*

Just like the defendant in *Benton*, Aurora is a Canadian corporation, does not have offices or property in Colorado, is not registered to do business in Colorado, and has no Colorado employees.[9] Docket No. 22-3 at 2-3, ¶¶ 3-7. Thus, like in *Benton*, the Court finds the first factor weighs against the exercise of personal jurisdiction, and the

---

[9] Mr. Michaux states that Aurora has no employees at all, but that "all of the individuals who have worked for Aurora are independent contractors based in British Columbia." Docket No. 22-3 at 2, ¶ 6.

Court should exercise "great care and reserve" before exercising personal jurisdiction over Aurora. *Benton*, 375 F.3d at 1079; *see also OMI Holdings*, 149 F.3d at 1096 (finding that the first factor weighed strongly in the defendant's favor when the defendant was a Canadian corporation).

### b. Forum State's interest

"States have an important interest in providing a forum in which their residents can seek redress for injuries caused by out-of-state actors." *OMI Holdings*, 149 F.3d at 1096 (citing *Burger King*, 471 U.S. at 483). Moreover, "the state's interest is also implicated where resolution of the dispute requires a general application of the forum state's law." *Id.* (citing *Asahi Metal Indus. Co. v. Superior Ct. of California, Solano Cnty.*, 480 U.S. 102, 115 (1987)).

As a result, Colorado has an important interest in providing a forum for Kilter to seek redress for injuries caused by Aurora, an out-of-state actor. While Aurora argues that no other Colorado residents were impacted, that does not minimize Colorado's interest in providing a forum for Kilter, a Colorado citizen. However, it is unlikely that Colorado law would apply to the portions of the claims which arise out of the interim purchase agreement for the allegedly defective 2024 light kits. The interim purchase agreement contains a choice-of-law clause stating that it is "governed by and is to be construed in accordance with the laws of the Province of British Columbia and the federal laws of Canada applicable therein." Docket No. 22-1 at 7. "Colorado generally recognizes contractual choice of law provisions." *Brown v. Fryer*, No. 12-cv-01740-CMA-KMT, 2013 WL 1191405, at *2 (D. Colo. Mar. 22, 2013) (citation omitted). Kilter seemingly ignores the choice-of-law clause in its response, asserting that "Colorado law applies to this matter." Docket No. 28 at 12. Kilter does not explain why Colorado law

would apply to the interim purchase agreement despite the choice-of-law clause and fails to mention the choice-of-law clause at all.  *See generally id.*  Without briefing on the choice-of-law clause, the Court cannot definitively determine its applicability.  However, the Court finds it is likely that Canadian law would apply to the claims which arise from the interim purchase agreement.

Thus, while Colorado has an interest in providing a forum for Kilter, it is undercut by the possible application of Canadian law.  But, because the Court cannot definitively determine whether Canadian law would apply, and because Canadian law likely only applies to claims arising under the interim purchase agreement, the Court finds that this factor weighs slightly in favor of Kilter.  *Cf. Benton*, 375 F.3d at 1079 (finding that the second factor does not weigh heavily in favor of either party when the plaintiff was a Colorado resident but Canadian law would govern the dispute); *OMI Holdings*, 149 F.3d at 1096 (finding that the second factor weighs heavily in favor of the Canadian defendant when neither party was a citizen of the forum state and when Canadian law would govern the dispute); *Burger King*, 471 U.S. at 481-82 (finding that a Florida choice of law clause weighed in favor of Florida exercising personal jurisdiction over the defendant).

### c. Plaintiff's Interest in Receiving Convenient and Effective Relief

"The third step in our reasonableness inquiry hinges on whether the Plaintiff may receive convenient and effective relief in another forum.  This factor may weigh heavily in cases where a Plaintiff's chances of recovery will be greatly diminished by forcing him to litigate in [ ] another forum because of that forum's laws or because the burden may

23

be so overwhelming as to practically foreclose pursuit of the lawsuit." *OMI Holdings*,
149 F.3d at 1097.

Kilter argues that it would be substantially burdened if it had to litigate this action
in British Columbia because its claims chiefly arise under Colorado law. While the
claims arising under the interim purchase agreement presumably apply Canadian law,
other claims—such as the Colorado Deceptive Trade Practices Act claim—involve
Colorado law. Docket No. 1 at 14-16, ¶¶ 63-70. Kilter does not, however, argue that
British Columbia courts applying Colorado law would foreclose its pursuit of the lawsuit.
Moreover, Kilter's argument ignores that the Court would likely have to apply Canadian
law to certain claims, which would be just as burdensome as British Columbia courts
applying Colorado law.

Moreover, Aurora has already sued Kilter in British Columbia for breach of
contract. Docket No. 22 at 15 n.10. A British Columbia court has agreed to hear the
case, stating that the interim purchase agreement has a forum selection clause which
"appear[s] to be valid, clear and enforceable" and, in any event, "that there is a real and
substantial connection between British Columbia and the dispute." Docket No. 34-1 at
16-17. Thus, because Kilter has to litigate in British Columbia in any event, it would not
be particularly more burdensome for it to also litigate this lawsuit in British Columbia.

Kilter argues that the Court should not consider the British Columbia action
because the Canadian court applied Canadian case law in agreeing to hear the case
and because Aurora filed the British Columbia action after Kilter initiated the action
before the Court. Docket No. 35 at 3. The Court finds these arguments unavailing.
First, it is unclear why it is problematic for a British Columbia court to apply Canadian

case law, especially given the choice of law clause in the 2024 purchase order, which likely means that Canadian law will be applied to certain claims regardless of where they are litigated. *See* Docket No. 22-1 at 7. Next, regardless of which party filed its action first, the British Columbia court has determined that it is able to preside over the action filed there. *See generally* Docket No. 34-1. Accordingly, the British Columbia lawsuit is going to proceed regardless of whether this Court exercises personal jurisdiction over Aurora, and Kilter will have to litigate in Canada either way.

Therefore, the Court finds that Kilter can receive convenient and effective relief in British Columbia, and that the third factor weighs in favor of Aurora.

### d. Interstate Judicial System's Interest in Efficient Resolution

The fourth factor contemplates whether the forum state is the most efficient place to litigate the action. *OMI Holdings*, 149 F.3d at 1097. "Key to this inquiry are the location of witnesses, where the wrong underlying the lawsuit occurred, what forum's substantive law governs the case, and whether jurisdiction is necessary to prevent piecemeal litigation." *Id.* (citations omitted).

Kilter claims that its witnesses will include representatives of the company. Docket No. 28 at 13. These representatives are located in Colorado. *Id.* Conversely, Aurora claims that Mr. Michaux, who is located in British Columbia, will be a primary witness. Docket No. 22 at 14. Moreover, Aurora asserts that Kilter may wish to call Aurora contractors and the recipients of the alleged defamatory emails, who are foreign nationals. *Id.* Thus, key witnesses are located in both Colorado and British Columbia. Moreover, as described above, both British Columbia law and Colorado law would apply to this action.

The underlying wrongs in this case occurred in British Columbia.  For example, Kilter alleges that "Aurora breached the parties' agreement by distributing and selling existing functional elements of the Kilter App to Kilter's direct competitors."  Docket No. 1 at 9, ¶ 30.  Aurora claims these alleged sales would have occurred in British Columbia.  Docket No. 22 at 11.  Additionally, Kilter did not ship the allegedly defective 2024 light kits to Kilter; instead, Kilter arranged for a third-party carrier to pick up the 2024 light kits from Aurora.  Docket No. 22-3 at 4-5, ¶ 23.  And the allegedly defamatory statements were sent from British Columbia.  *Id.* at 5, ¶ 26.  Furthermore, the exercise of personal jurisdiction would create piecemeal litigation, as claims arising out of the sale of the 2024 light kits is ongoing in British Columbia.  *See generally* Docket No. 34-1.  Thus, similar claims would be litigated in two different forums if the Court exercised personal jurisdiction over Aurora.  Finally, the interim purchase agreement contains a forum selection clause stating that "[t]he parties accept and submit to the exclusive jurisdiction of the federal or provincial courts located in Vancouver, British Columbia, Canada."  Docket No. 22-1 at 7.  Forum selection clauses are "prima facie valid and should be enforced unless shown to be unreasonable."  *Milk 'N' More, Inc. v. Beavert*, 963 F.2d 1342, 1344 (10th Cir. 1992) (citation and internal quotations omitted).  Kilter offers no argument that the forum selection clause is unreasonable, and, as mentioned above, a British Columbia court has determined that the forum selection clause appears to be enforceable.  Docket No. 34-1 at 16.  Thus, it is possible that some of Kilter's claims in this lawsuit might ultimately wind up in British Columbia in any event.  Accordingly, the Court finds that the fourth factor weighs in favor of Aurora.

26

### e.  Social Policies

"The fifth factor of the reasonableness inquiry focuses on whether the exercise of personal jurisdiction by [the forum] affects the substantive social policy interests of other states or foreign nations."  *Benton*, 375 F.3d at 1080 (internal quotations and citation omitted).  In *Benton*, the Tenth Circuit found that exercising personal jurisdiction over a Canadian corporation could interfere with Canada's sovereignty.  *Id.*  Thus, the court found "that an exercise of personal jurisdiction would affect Canada's policy interests" and found that the fifth factor weighed in favor of the defendant.  *Id.*; *see also OMI Holdings*, 149 F.3d at 1090 (finding that exercising personal jurisdiction over a Canadian corporation would affect the policy interests of Canada).

Kilter argues that the exercise of personal jurisdiction would not interfere with Canada's sovereignty because Aurora chose to conduct business with Kilter.  However, in *Benton*, the defendant likewise chose to conduct business with a Colorado resident, but the court nevertheless found that the fifth factor weighed in favor of the defendant. *Benton*, 375 F.3d at 1080.  Thus, the Court finds that the fifth factor in this case weighs in favor of Aurora.

Accordingly, every factor except for the second factor weighs in favor of Aurora. Considering these factors as a whole, the Court finds that the exercise of personal jurisdiction over Aurora would be unreasonable and would "offend traditional notions of fair play and substantial justice."  *Newsome*, 722 F.3d at 1271 (citation omitted).

## IV.  CONCLUSION

Therefore, it is

**ORDERED** that Defendant's Motion to Dismiss [Docket No. 22] is **GRANTED**.  It is further

**ORDERED** that plaintiff's claims are **DISMISSED without prejudice**.  It is further

**ORDERED** that this case is closed.

DATED March 30, 2026.

BY THE COURT:

PHILIP A. BRIMMER
United States District Judge